(No. 19842.—

THE CHICAGO AND EASTERN ILLINOIS RAILWAY COMPANY *et al.* Appellants, *vs.* THE COMMERCE COMMISSION *ex rel.* The Hoopeston Grain and Coal Company *et al.* Appellees.

*Opinion filed October 25, 1930—Rehearing denied Dec. 3, 1930.*

ELMER A. SMITH, W. J. STEVENSON, JAMES A. KNOWL-
TON, G. A. GLADSON, J. F. CONNORS, W. M. PROVINE, and
ACTON, ACTON & SNYDER, (K. L. RICHMOND, and WIL-
LIAM M. ACTON, of counsel,) for appellants.

JAMES C. WOODBURY, FREDERICK BORN, ROBERT BACON,
and ISAAC BORN, for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

The Hoopeston Grain and Coal Company and other re-
tail dealers in coal at Hoopeston, Illinois, filed complaints
before the Illinois Commerce Commission praying reduc-
tions in coal rates charged by the Chicago and Eastern Illi-
nois Railway Company and other carriers, defendants, and
also praying reparation for alleged overcharges already col-
lected. The substance of the complaints was that the rates
maintained by the defendants were excessive and unreason-
able and unjustly discriminatory against complainants and
their traffic as compared with allegedly preferential rates
applied to the transportation of coal from points of origin
in the same territory to other destinations. The points of
origin dealt with in the complaints and the order of the
commission may be designated as the Danville group, the
Springfield group, the Southern Illinois group and the In-
diana group. Reductions were ordered as to the Danville,
Springfield and Southern Illinois groups, the rates pre-
scribed per ton between such groups and Hoopeston being
80, 135 and 165 cents, respectively. Reparation was also

provided for. The order was affirmed by the circuit court of Vermilion county, and the cause is here on appeal from the judgment of that court.

The commission's order is challenged at the outset on the ground that it does not contain sufficiently specific findings of fact to enable the court to review the commission's action. It is true that the commission must make findings of fact upon the principal issues in the case, and if such findings are lacking the order is ineffective. (*Chicago Railways Co.* v. *Commerce Com.* 336 Ill. 51; *Business Men's Ass'n* v. *Commerce Com.* 337 id. 149; *Brotherhood Locomotive Firemen and Enginemen* v. *New York Central Railroad Co.* 339 id. 201.) In order that the courts may intelligently review the decisions of the commission the latter must make its findings sufficiently specific to enable the courts to determine whether such decisions are based on such findings. (*Business Men's Ass'n* v. *Commerce Com. supra.*) An objection similar to that raised here was made in *Meeker* v. *Lehigh Valley Railroad Co.* 236 U. S. 412, where the court said: "Upon examining the reports as set forth in the record we think they contain findings of fact which meet the requirements of the statute, and that the facts stated in the findings, if taken as *prima facie* true, sustain the award of the commission. True, the findings in the original report are interwoven with other matter and are not expressed in the terms which courts generally employ in special findings of fact, but there is no difficulty in separating the findings from the other matter or in fully understanding them." Apart from the fact that, in some connections, there is difficulty in the within case in separating the findings from other matter, the conclusion thus expressed is fairly applicable to the present record.

The commission may be held to have found, therefore, that Hoopeston is situated at the eastern boundary of the State of Illinois, approximately 100 miles south of Chicago and 24 miles north of Danville; that it is located on the

main line of the Chicago and Eastern Illinois railway be-
tween Evansville, Indiana, and Chicago, and on the east and
west line of the New York, Chicago and St. Louis railroad
between Peoria, Illinois, and Frankfort, Indiana; that on
December 1, 1916, the rate from the Danville group to
Hoopeston was 60 cents; that on July 1, 1922, this rate
became 136 cents; that on December 1, 1916, the rate
from the Springfield group to Hoopeston was 82 cents; that
on July 1, 1922, this rate became 165 cents; that on De-
cember 1, 1916, the rate from the Southern Illinois group
to Hoopeston was 102 cents; that on July 1, 1922, this
rate became 192 cents; that on December 1, 1916, the rate
from the Indiana group to Hoopeston was 77 cents; that
this rate subsequently became 138 cents; that the percentage
of increase in rates was thus 127 per cent in the case of
the Danville group, 101 per cent in the case of the Spring-
field group, 88 per cent in the case of the Southern Illinois
group and 91 per cent in the case of the Indiana group,
and that freight rates generally in the State of Illinois dur-
ing the same period increased approximately 65½ per cent.
The order sets out a table indicating that there was a dis-
agreement between the parties as to the average distance
between Westville, in the Danville group, and Hoopeston,
complainants alleging it to be 33 miles whereas appellants
claimed that it was 46 miles, the extra mileage claimed by
appellants including yard movements found by the com-
mission to be for the operating convenience of the carrier.
The average distance between other points in the Danville
group and Hoopeston was found to be 32 miles, between
the Springfield group and Hoopeston 143 miles, and be-
tween the Southern Illinois group and Hoopeston 231 miles.
The average distance from the Indiana group to Hoopeston
was found to be approximately 70 miles, and it was found
that the rates from Humrick, Illinois, 45 miles distant from
Hoopeston, were the same as from the Indiana group ex-
cept to points in Indiana for intrastate hauls of less than

50 miles. The order sets out a table of rate comparisons, giving average distances in miles between the Danville group and Chicago, the Springfield group and Chicago, the Southern Illinois group and Chicago, the Indiana group and Chicago, Farmington and Cuba, Illinois, and Galesburg, Illinois, Evansville, Indiana, and Hoopeston, Evansville and Indianapolis, Indiana, as well as average distances in miles between various other places, and showing in each instance the existing rates. In commenting upon this table the order states:

"It will be observed that comparison is made of the rates here assailed with the rates maintained from the same origin groups to Chicago, Illinois, Hoopeston being intermediate between the mines and Chicago. Defendants contend there are certain conditions that tend to keep the rates for the transportation of coal to Chicago, Illinois, at or below a reasonable maximum level. * * * The record discloses that during 1923 there were transported to the Chicago district 17,000,000 tons of coal from mines in Illinois, Indiana and Western Kentucky, 12,000,000 tons of eastern coal by rail carriers and 1,250,000 tons of eastern coal via the Great Lakes, the total movement being 30,250,000 tons. The defendants estimate the annual movement of coal to Hoopeston, Illinois, to be not more than 10,000 tons, therefore the preponderance of the coal movement to the Chicago district is readily apparent. Defendants direct attention to the fact that during 1923 1,250,000 tons of eastern coal were transported to the Chicago district via the Great Lakes while none of the coal transported to Hoopeston is handled by water carriers. Defendants also contend that, aside from the water competition encountered by the rail carriers in the movement of coal to the Chicago district, the rail carriers' competition is more keen at Chicago than at Hoopeston, because some of the railroads directly serving the eastern coal fields reach the Chicago district with their own rails, while none of the carriers directly serving

Hoopeston, Illinois, reach the eastern coal fields with their own rails. It is not apparent upon this record that the rates on coal to the Chicago district were established on a sub-normal basis for the purpose of competing in anywise with the water-borne coal moving into the Chicago district." The order then refers to other suggestions made by defendants in explanation of the Chicago rates and proceeds: "The rates from Illinois mines to Chicago, Illinois, had their origin in the entry of an order by the Illinois commission prescribing just and reasonable rates, following an exhaustive investigation to determine the rates to which the railroads were entitled in order to pay all operating costs, depreciation, taxes and a fair return on investment. They were not made by giving consideration to the competitive conditions which the defendants contend influence the existing rates." Then follows a table showing the differences in distances and rates from the several groups to Hoopeston and Chicago. The Holmes & Hallowell case, involving the transportation of coal from Duluth, Minnesota, and related Lake Superior ports, to destinations in Minnesota and North and South Dakota, is cited, and the order continues: "The transportation conditions surrounding the movement of coal in the territory in which this scale is applied are more difficult and the density of traffic less than obtains in Illinois, which circumstances justify a lower level of rates in Illinois. * * * It will be observed that the rate prescribed under the Holmes & Hallowell scale is 94 cents for distances ranging from 31 to 40 miles, which indicates the present rates to Hoopeston, Illinois, of 123 cents from Westville, Illinois, and of 136 cents from Missionfield, Gray and Dolan, Illinois, (Danville group) are excessive." The order then continues: "It appears that the principal basis for the rates proposed by the complainants is the distance scale prescribed by the Public Service Commission of Indiana for application between points within the State of Indiana of less than 30 miles," and points out that these

rates were approved by the Interstate Commerce Commission. After setting out these rates the order proceeds: "The Interstate Commerce Commission has held that the territory comprising Indiana and Illinois, from the standpoint of transportation and traffic conditions, is essentially similar in character. * * * The evidence in this case clearly shows, as has been stated, that the rates from the Illinois mines to Chicago, Illinois, were not determined with relation to any competition that the Illinois coals meet in the Chicago market but that they were fixed with reference to the measure of the rate several years ago. To these rates have been added the general increases that have been applied to freight rates generally. In reaching our conclusion that the appropriate rate to apply from the Southern Illinois group of mines to Hoopeston, Illinois, is 165 cents for a distance of 231 miles, we are not unmindful that the present rate from the Springfield group of mines to Chicago is 165 cents for a distance of 225 miles and that there is a greater terminal expense in effecting deliveries in the Chicago switching district. * * * After deducting the minimum expense of 30 cents in the Chicago switching district the rate of 195 cents produces per ton mile earnings of 5 mills, while, after deducting the terminal expenses of 13 cents at Hoopeston, Illinois, from the rate of 165 cents from Southern Illinois to Hoopeston, Illinois, the earnings per ton mile are 6½ mills. * * * The rate of 135 cents, which we find to be just and reasonable from the Springfield group of mines for an average distance of 143 miles, after deducting the terminal expense at Hoopeston, Illinois, of 13 cents, produces earnings per ton per mile of 8.4 mills. This is compared with the earnings per ton per mile from the same group of mines to Chicago, Illinois. The rate to Chicago is 165 cents, and after deducting the minimum terminal expense of 30 cents per ton in the Chicago switching district produces earnings per ton per mile of 6 mills. It will thus be observed that the earnings per ton per mile

produced by the rates prescribed from both the Southern Illinois and Springfield group of mines to Hoopeston greatly exceed the earnings per ton per mile from the same group of mines to Chicago, Illinois, for the line haul and assembling services. Whatever differences exist with reference to the transportation services are confined to the additional haul of 100 miles north of Hoopeston and the greater terminal expense in performing the switching services to make deliveries in the Chicago switching district."

It is apparent that the commission established the rates ordered upon the basis of findings (1) that existing rates had been increased to an extent above the average increase of rates generally; and (2) that the rates attacked were too high by comparison with ton-mile earnings and rates established elsewhere. The order cannot be sustained upon the findings comparing the percentages of increase of the rates complained of with the percentage of increase of rates generally. Such comparison is not alone a proper foundation for an order fixing a rate, since the order must be based upon what is reasonable at the time. A mere difference in percentage of increase or decrease of rate is not, of itself, evidence that any rate is too high or too low or is unjustly discriminatory. (*Atchison, Topeka and Santa Fe Railway Co.* v. *Commerce Com.* 335 Ill. 624; *Commerce Com.* v. *Illinois Traction,* 335 id. 247; *Commerce Com.* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 320 id. 214.) Nor can the order be sustained upon the findings making comparison between the rates attacked and the rates and ton-mile earnings elsewhere. While comparisons of existing charges and of ton-mile earnings constitute proper elements for consideration in determining what are reasonable rates, the qualification that the charges were made and the ton-mile earnings gained under similar conditions of operation is essential to the probative value and competency of such rate comparisons. To afford a sufficient basis for comparison there must be findings of fact show-

ing such similar conditions of operation as well as findings as to distances and rates. (*Atchison, Topeka and Santa Fe Railway Co.* v. *Commerce Com. supra; Alton and Southern Railroad* v. *Commerce Com.* 316 Ill. 625.) Findings must be based on evidence presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such. (*Atchison, Topeka and Santa Fe Railway Co.* v. *Commerce Com. supra; Chicago Motor Bus Co.* v. *Chicago Stage Co.* 287 Ill. 320.) The former proceedings of the commission to which reference is made are not set out in the abstract and apparently were not introduced in evidence, nor does the record show that other evidence was introduced to support the findings that the rates involved in such former proceedings were not determined with relation to any competition that Illinois coals meet in the Chicago market. Consequently these findings cannot stand, and the further findings as to difference in terminal charges at Danville and Chicago become of no moment. Even assuming the conclusion in connection with the Holmes & Hallowell case that "the transportation conditions surrounding the movement of coal in the territory in which this scale is applied are more difficult and the density of traffic less than obtains in Illinois, which circumstances justify a lower level of rates in Illinois," to be a sufficient finding of fact, in connection with findings as to comparative rates, to justify the order, there is no substantial evidence to support it and it must be set aside. As to the Indiana scale of rates and the statement of the Interstate Commerce Commission that from the standpoint of traffic and transportation conditions the territory in Indiana and Illinois is essentially similar, facts found in cases before other tribunals, between different parties and on different issues are no evidence in the present cause and cannot be accepted as constituting a

proper basis for the Illinois commission's action. *Atchison, Topeka and Santa Fe Railway Co.* v. *Commerce Com. supra.*

The judgment is reversed and the cause remanded to the circuit court, with directions to set aside the order of the Commerce Commission and to remand the cause for further consideration by the commission in accordance with the views expressed in this opinion.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*