(No. 33254.—
ANTIOCH MILLING Co. *et al.,* Appellants, *vs.* PUBLIC SERVICE COMPANY OF NORTHERN ILLINOIS, Appellee.

*Opinion filed November 18, 1954.*

G. W. HORSLEY, and L. H. LENZ, both of Springfield, for appellants.

ISHAM, LINCOLN & BEALE, and DALEY & LYNCH, both of Chicago, (WILLIAM W. DARROW, and J. CARL MARTINDALE, of counsel,) for appellee.

LATHAM CASTLE, Attorney General, of Springfield, (HARRY R. BEGLEY, and JOHN L. ROACH, of counsel,) for Illinois Commerce Commission.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

Antioch Milling Co. and the other appellants in this case operate public grist mills which are supplied with electric power by the appellee, Public Service Company of Northern Illinois. Until July 15, 1951, this power was furnished to the appellants under a rider which set a special maximum of 3.5 cents per kilowatt hour upon the charges which would otherwise have been payable under the applicable standard rate. On June 14 and 15, 1951, as a part of a program of rate simplification which it had undertaken, the utility filed with the Illinois Commerce Commission a proposed schedule of new rates. The net effect of all of the rate changes proposed was to reduce slightly the utility's annual revenue. Among the changes, however, was one which called for a progressive increase in the maximum charge under the rider applicable to the appellants during the years 1952 and 1953, and for its abolition after December 31, 1953. These changes, it is conceded, substantially increase the cost of power to public grist mill operators.

The appellants were notified of the proposed changes and were also notified that on July 9 a hearing would be

held before the commission upon the utility's motion that the new schedule be permitted to go into effect upon July 15, 1951, and that it not be suspended by the commission. A number of the mill operators appeared in response to the notice. Exactly what occurred at this hearing is not clear from the record, but it appears that the utility offered evidence of the extent to which its customers' billing would be increased, and also offered evidence that the rider had become obsolete and discriminatory. The commission, without making any findings, made an entry in its docket on July 15, 1951, allowing the motion not to suspend the rates.

On May 16, 1952, the appellants filed a complaint with the commission alleging that the new schedule of rates was unreasonable and discriminatory, and also that the commission had improperly permitted the new rate to go into effect without first finding that the increase was necessary in order to give the utility a fair return on its investment. The commission, after a hearing, dismissed the complaint, and its action was sustained on appeal by the circuit court of Livingston County.

We consider first the appellants' procedural contention that the commission had no power to permit the new schedule to go into effect without a hearing, specific findings showing the need for the increase, and an order granting that increase.

The procedure for changing rates is set out in section 36 of the Public Utilities Act. (Ill. Rev. Stat. 1953, chap 111⅔, par. 36.) That section requires that the utility must file its proposed new schedule with the commission thirty days before the schedule is to become effective. After the schedule is filed "the Commission shall have power, and it is hereby given authority, either upon complaint or upon its own initiative without complaint, at once, * * * to enter upon a hearing concerning the propriety of such rate or other charge, * * * and pending the hearing and decision thereon, such rate or other charge * * *

shall not go into effect. * * * On such hearing the Commission shall establish the rates or other charges * * * proposed, in whole or in part, or others in lieu thereof, which it shall find to be just and reasonable. All such other rates or other charges * * * not so suspended shall, on the expiration of thirty days from the time of filing the same with the Commission, or of such lesser time as the Commission may grant, go into effect and be the established and effective rates or other charges, * * * subject to the power of the Commission, after a hearing had on its own motion or upon complaint, as herein provided, to alter or modify the same."

This language seems clearly to contemplate that the commission shall analyze a proposed rate change, and reach a conclusion as to whether it is to be permitted to go into effect without a formal hearing, or whether it is to be suspended until a formal hearing has been had. That this is what the section means is confirmed by the fact that an earlier provision, which unmistakably required the commission to make findings before allowing a rate increase to become effective, has been repealed. Under the Public Utilities Act of 1913, section 36 also provided, "No public utility shall increase any rate or other charge, or so alter any classification, contract, practice, rule or regulation as to result in any increase in any rate or other charge, under any circumstances whatsoever, except upon a showing before the commission and a finding by the commission that such increase is justified." (See Hurd's Stat. 1913, chap. 111a, par. 36; Laws of 1913, p. 459, sec. 36.) This provision was repealed with the enactment of the present Public Utilities Act in 1921, (Laws of 1921, p. 702, art. VII, sec. 87; Ill. Rev. Stat. 1953, chap. 111⅔, par. 91,) and no corresponding language appears in the present statute.

The commission has thus been given authority either to suspend the new rate or let it go into effect, a technique of utility regulation which is not at all uncommon. (See,

*e.g.,* 49 U.S.C. 15(7), 316(g).)` Appellants, indeed, do not explicitly deny that the commission has been given this power, but they contend that the commission's choice can be exercised only upon appropriate findings, and they cite a number of cases in which this court has held that orders by the commission will not be sustained unless they are supported by specific findings of fact. It is true that orders rendered in complaint proceedings under sections 64 and 65 must be supported by specific findings. (*Peoples Fruit and Vegetable Shippers Ass'n* v. *Commerce Com.* 351 Ill. 329; *Chicago and Eastern Illinois Railway Co.* v. *Commerce Com.* 341 Ill. 277.) The same requirement has been imposed upon certain other proceedings before the commission. (*Central Northwest Business Men's Ass'n* v. *Commerce Com.* 337 Ill. 149; *Kewanee and Galva Railway Co.* v. *Commerce Com. ex rel. Dohrn Transfer Co.* 340 Ill. 266.) In each case, however, the requirement has been based on an express statutory command.

. Section 65, which governs complaint proceedings, provides, "* * * (T)he Commission shall make and render findings concerning the subject-matter and facts inquired into and enter its order based thereon." And the fourth paragraph of the same section states, "In any matter concerning which the Commission is authorized to hold a hearing, * * * the hearing shall be conducted in like manner as if complaint had been made to or by the Commission." (Ill. Rev. Stat. 1953, chap. 111⅔, par. 69.) If there is any requirement that findings must always be made by the commission before a rate change can become effective, it must be imposed by the latter of these two provisions, since the proposed rate change and the motion not to suspend did not arise under section 65.

In our opinion this catch-all provision of section 65 is not to be read as so modifying section 36 as to require findings in support of the commission's conclusion that the proposed rates should go into effect without suspension.

It is true that section 36 refers to a "hearing concerning the propriety" of proposed rates. Our concern here, however, is not with a hearing of that character, but rather with the commission's procedure in deciding whether to enter upon such a hearing. The statute does not specify a particular method to be followed by the commission in deciding the matter, and we think that the choice of method rests with the commission. It follows that the commission's election here to hold a preliminary hearing in order to ascertain the views of interested persons, did not require that hearing to conform to the statutory standards laid down in section 65. The substantive requirement that rate increases have the prior approval of the commission has been repealed, and the decision whether to suspend them has been committed to the discretion of the commission. (*Cf. Carlsen* v. *United States,* 107 Fed. Supp. 398.) To require that decision to be founded on findings would erase the discretion given to the commission and revive what the legislature has repealed.

We hold, therefore, that the commission did not err in permitting the proposed rates to go into effect without a formal hearing and formal findings and order.

The remaining issues concern the hearing held by the commission upon the complaint filed by appellants. The first contention is that substitution of the standard rate for the special rate which was formerly applicable to public grist mills under the rider, discriminates against operators of public grist mills and in favor of "commercial" mills. Commercial mills buy grain, grind it, and sell the product. Grist mills are custom grinders; farmers bring their grain to these mills to have it separately ground, and each farmer gets back his own grain. Because grinding is done on this individual basis, a grist mill's machines are idle for a greater part of the time than are those of a commercial mill.

Under the standard rate this difference in operations is reflected in a difference in the cost of power. Under that

rate a customer, besides being billed for the total number of kilowatt hours consumed within the billing period, is also billed on a demand charge, which is based on the maximum number of kilowatts used during any thirty-minute interval within the billing period. Since the demand charge remains the same regardless of the total amount of kilowatt hours used, the average cost per kilowatt hour decreases in proportion to the number of hours during which electrical equipment is in operation. Under the rider which the appellants seek to have restored the effect of the demand charge was avoided, because the customer was not billed under the standard rate unless the charge calculated thereunder was less than the maximum of 3.5 cents per kilowatt hour set by the rider. In point of fact the charges under the standard rate almost always exceeded the maximum. The appellants admit that the practical effect of the rider was to eliminate the impact of the standard demand charge.

It is conceded by the utility that the appellants' cost will be substantially increased with the abolition of the rider. Appellants go further, contending that the increase is so great that they will be unable either to absorb it or pass it on to their customers, and that they will be put out of business, thus forcing farmers to resort to the commercial mills. Quite aside from the fact that the record does not support these predictions, we are unable to see that appellants' allegations make out a case of discrimination forbidden by the act. A demand charge is designed to allocate to a utility's customers their fair portion of those fixed costs which must be incurred by the utility regardless of the amount of power which is actually supplied. It is the price which must be paid for the construction and maintenance of a plant with sufficient capacity to satisfy its customers' demands. Such a charge for the utility's readiness to serve is proper. See: *City of Rochester* v. *Rochester Gas and Electric Corp.* 233 N.Y. 39, 134 N.E.

828; *Smith* v. *Public Utilities Commission of Ohio,* 130 Ohio St. 328, 199 N.E. 179; Barnes, Economics of Public Utility Regulation, pp. 339-342 (1947); *cf.* Ill. Rev. Stat. 1953, chap. 111⅔, par. 32.

Appellants' real complaint is that such a charge bears most heavily on those whose consumption is irregular. That is its purpose, and of course that is its effect. But the appellants cannot require a public utility to adjust its rates to compensate for economic disadvantages arising out of their method of doing business. "The law does not attempt to equalize fortune, opportunities or abilities." (*Interstate Commerce Com.* v. *Diffenbaugh,* 222 U.S. 42, 46; *cf. Illinois Central Railroad Co.* v. *Commerce Com.* 359 Ill. 563, 569-570.) Nor can appellants escape this rule by characterizing their business as a "public convenience and necessity." (See Public Laws of Illinois, 1871-72, p. 563, secs. 1-11, repealed, July 15, 1941, Laws of 1941, p. 1284, sec. 1; *Gaylord* v. *Sanitary District of Chicago,* 204 Ill. 576; *Crawshaw* v. *Curtis,* 119 Ill. App. 42.) The Public Utilities Act does not authorize the commission to decree preferential rates on the basis of its own estimate of an occupation's social or economic desirability. The preferential rate here involved was introduced around 1911 with the aim of stimulating daytime consumption of power, which at that date was relatively slight. The recipient of the benefit of a preferential rate designed to increase off-peak demand has no cause for complaint if it is discontinued.

The appellants next contend that the commission had no power to approve this rate change without a showing by the utility of present values and rate of return upon investment which would establish that the former rate was unreasonably low. They argue that there is a burden of proof upon a utility to justify any rate increase, and that this burden must be discharged at some stage in the proceedings, either under section 36, when the new rate is

filed, or in subsequent complaint proceedings under section 64.

It is clear from what we have said concerning the commission's power of suspension that no such burden exists under section 36. The language of that section, and the repeal of the former provision, make it clear that the decision whether to initiate an inquiry into proposed rates, like the decision whether to suspend them, lies in the discretion of the commission. If the commission declines to enter on such an inquiry, then obviously the utility is not required to justify its rates, whether by a showing of value or otherwise.

Nor do we think the utility was required to meet the asserted burden in the complaint proceeding in this case. Section 30 of the act provides, "In all proceedings before the Commission, initiated by the Commission upon its own motion, or initiated by an application of such public utility, in which the value of the property of any publc utility or utilities is an issue, the burden of establishing such value shall be upon such public utility or utilities." (Ill. Rev. Stat. 1953, chap. 111⅔, par. 30.) Since the legislature has explicitly enumerated the kinds of proceedings in which a utility must prove value, it is a fair inference that no such burden is otherwise imposed. Certainly as a practical matter a utility should not, in the absence of explicit legislative direction, be required to embark upon a full dress justification of its rate structure every time an individual customer files a complaint. Our decisions have consistently assumed that in complaint proceedings the burden is upon the complainant to show that existing rates are unreasonable or discriminatory. *State Public Utilities Com. ex rel. Farmers' Illinois Grain Dealers Ass'n* v. *Atchison, Topeka and Santa Fe Railway Co.* 278 Ill. 58, 71; *Commerce Com. ex rel. Danville Brick Co.* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 320 Ill. 214, 219; *Commerce*

*Com. ex rel. Brown Shoe Co.* v. *Illinois Traction, Inc.* 335 Ill. 247, 250; *Chicago and Eastern Illinois Railway Co.* v. *Commerce Com. ex rel. Cairo Association of Commerce,* 343 Ill. 117, 124; *Moline Consumers Co.* v. *Commerce Com. ex rel. Chicago, Burlington and Quincy Railroad Co.* 353 Ill. 119, 127.

In our opinion, this argument, like that which appellants addressed to the commission's power to suspend rates, is based on a misconception of the purpose of the Public Utilities Act and of the role of the commission in administering it. The commission is not just an umpire. It has been given active functions of policy making and supervision. It may initiate hearings on its own motion, and it has a wide discretion in shaping proceedings brought by others. The act provides that rates shall be reasonable; but it entrusts the enforcement of that obligation in the first instance to the commission.

Since we hold that the abolition of the rider was not discriminatory, and that the appellee was not required to justify it on a cost basis, it is unnecessary to consider appellants' objection to the commission's finding that the increase in the utility's daytime load has made the preferential rate under the rider no longer necessary, and that administration of the rider is expensive and impractical. It is also argued that the long continuance of the rider creates a presumption that it was reasonable. We question whether this is so, (*cf. Southern Pacific Co.* v. *Interstate Commerce Com.* 219 U.S. 433,) but the main point is that the issue before the commission was not the reasonableness of the former rate but the reasonableness of the new rate. *Cf. Produce Terminal Corp.* v. *Commerce Com. ex rel. Peoples Gas Light and Coke Co.* 414 Ill. 582, 597.

Error is also assigned on the exclusion of evidence of lower rates to grist mills charged by other public utilities. Since appellants made no offer to show that the conditions of service were comparable, the evidence was properly ex-

cluded. *Moline Consumers Co. v. Commerce Com.* 353 Ill. 119, 126; *Chicago and Eastern Illinois Railway Co. v. Commerce Com.* 343 Ill. 117; *Chicago and Eastern Illinois Railway Co. v. Commerce Com. ex rel. Hoopeston Grain and Coal Co.* 341 Ill. 277; *Commerce Com. v. Illinois Traction, Inc.* 335 Ill. 247, 251; *Alton and Southern Railroad v. Commerce Com. ex rel. Perry Coal Co.* 316 Ill. 625, 628-629.

The judgment of the circuit court must therefore be affirmed.

*Judgment affirmed.*