**1022**

THE PEOPLE OF COOK COUNTY *ex rel.* JACK O'MALLEY, State's Attorney of Cook County, Petitioner-Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

First District (6th Division)   Nos. 1—91—0046, 1—91—0172, 1—91—0501 cons.

Opinion filed September 25, 1992.—Modified on denial of rehearing December 4, 1992.

Jack O'Malley, State's Attorney, of Chicago (Thomas H. Rowland and Sheila Macmanus, Assistant State's Attorneys, of counsel), for petitioner.

Roland W. Burris, Attorney General, of Springfield (David L. Nixon, Special Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Kevin M. Forde and Hopkins & Sutter, both of Chicago (Paul F. Hanzlik, John Gavin, David Goroff, and Steven A. Levy, of counsel), for respondent Commonwealth Edison Company.

JUSTICE RAKOWSKI delivered the opinion of the court:

Petitioner-appellant, the People of Cook County ex rel. Jack O'Malley, State's Attorney of Cook County (Cook County), appeals an order of respondent-appellee Illinois Commerce Commission (the ICC), which held that respondent-appellee Commonwealth Edison Company (Edison) did not violate the law in the dispatch of its western coal fired plants. The order appealed from was entered in a fuel adjustment proceeding, as required by statute (see Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—220). At issue in such a proceeding is whether a utility collected authorized amounts under its fuel adjustment clause during a given year when compared to the actual costs of fuel and power purchased by the utility. After considering Cook County's arguments, we affirm.

██ The relevant facts are as follows. The electronic service rates Edison charges to its customers are subject to advance approval by the ICC under the statutory authority of the Illinois Public Utilities Act (the Act) (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 1 et seq.). Edison may only charge its customers the rates it has on file with the Commission. Generally, once rates are established with the ICC they are fixed. Section 9—220 of the Act, however, also provides in pertinent part:

> "Notwithstanding the provisions of [this Article], the Commission may authorize the increase or decrease of rates and charges based upon changes in the cost of fuel used in the generation or production of electronic power *** through the application of fuel adjustment clauses." (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 9—220.)

This exception exists for the purpose of allowing fuel costs or savings to be passed through to customers promptly, absent the need for frequent rate case proceedings. Re Uniform Fuel Adjustment Clauses (Ill. Com. Comm'n 1981), 45 Pub. Util. Rep. 4th 1, 3-4.

A uniform fuel adjustment clause (FAC) the ICC adopted in 1981 (see Commission General Order 211, reported at 83 Ill. Adm. Code §425 (1991)) (the Code) contains a mathematical formula by which fuel charges to customers change each month to reflect changing costs of fuel and purchased power, and allows for current recovery of such costs by the utility. Under section 425.20 of the

Code, fuel costs which are passed through this section of the Code are required to represent either actual, historical costs or estimates of actual costs as they become available.

Section 9—220 also provides that the ICC monitor the application of a utility's FAC. Utilities file with the ICC monthly calculations of FAC charges and submit to annual audits of FAC charges and costs. (*Re Uniform Fuel Adjustment Clauses*, 45 Pub. Util. Rep. 4th at 18.) Additionally, section 9—220 provides that the ICC conduct annual public hearings to determine the prudence of costs passed on to consumers and to reconcile the costs collected under the FAC with the actual costs incurred. The ICC will order refunds if it determines that the charges passed on through the FAC do not represent actual costs of prudently purchased fuel. It was via the authority of section 9—220 that the ICC ordered Edison *sub judice* to present a reconciliation and to demonstrate prudence of its purchases of fuel and power during the relevant periods.

■ Section 425.40(a) of the Code requires that electrical utilities adhere to economic dispatch in the operation of their generating units. That section defines "economic dispatch" as:

"the operation of the electric utility's system, utilizing the sources of available power to achieve minimum overall costs, taking into consideration the utility's voltage, frequency, reliability, environmental, safety and service quality requirements, as well as the utility's existing contractual obligations." 83 Ill. Adm. Code §425.40(a) (1991).

■ William Gould, the ICC's senior economic analyst in the planning and operations section of the engineering department of the public utilities division, testified that the principles of economic dispatch require that incremental and fixed costs be distinguished. Fixed costs are those costs which are incurred regardless of the amount of generation or operation of a generating unit—or whether energy is produced at all. Incremental costs, on the other hand, are those costs which vary with production and are proportional to the amount of energy produced. A utility satisfies the economic dispatch requirement when units with lower incremental costs are operated ahead of those with higher incremental costs. In order to minimize total system costs, the utility must dispatch its generating units based upon incremental costs, and not based on total costs or other costs.

In the mid-1970's, Edison entered into long-term coal contracts with three coal companies—Black Butte, Big Horn and Decker. These contracts shall hereinafter be referred to as the "western

coal contracts." The long-term nature of the western coal contracts was insisted upon by the contracting coal companies, and the original contracts required that Edison accept delivery of and pay for a designated minimum quantity of coal each year. At the time the western coal contracts were entered into, Edison's needs were based upon forecasts which projected that demand for electricity would increase at least 5% per year. The western coal contracts provided coal to suit about 60% of Edison's needs at the time. As it turned out, electrical demand did not increase as expected, and consequently, the western coal contracts provided for the delivery of more coal than Edison needed to generate electricity.

In response, Edison negotiated a number of amendments to the western coal contracts in the years 1982, 1983, 1986 and 1988. Under the amendments, Edison paid about 75% of the contracts' cost of a ton of coal as "mineral rights" or "reserve charge" when it could not take the costs as scheduled. Upon this payment, Edison was entitled to defer delivery of the paid-for coal to a later date, and Edison would be obligated to pay the remaining 25% when it accepted delivery of the deferred coal.

Testimony before the ICC established that minimum overall costs are realized when generating units are dispatched on the basis of incremental costs. ICC staff witness William Gould testified that as fixed costs are always present, only variable or incremental costs should effect the dispatch of the utility's generating system. Staff witness Kenneth Costello testified that "dispatching on the basis of incremental costs minimizes a utility's total operating costs." Robert Beckwith, Edison's manager of fuel, stated that as Edison was obliged to pay for mineral rights, they should be considered as fixed costs and not used for dispatching purposes. Costello agreed that Edison's calculation of incremental costs for the dispatch of its western coal fired units properly excluded the 75% reserve charge.

The ICC found that Edison's dispatch methodology should be upheld, and that the evidence established that Edison's system is operated to achieve minimum overall cost and satisfied the requirement of economic dispatch.

On June 21, 1989, the ICC staff filed a motion to amend the hearing schedule with respect to the issue of Edison's prudence in its western coal contracts in 1985 and 1986. The ICC hearing examiners granted the staff's motion and consolidated consideration of the prudence of Edison's western coal contracts for 1985 and 1986 with Edison's FAC proceeding for 1987. Eventually, upon the motion of a governmental intervenor not a party to this appeal, con-

sideration of Edison's prudence in the western coal contracts in 1985, 1986 and 1987 was consolidated into the docket for the FAC proceeding for the year 1988. Cook County is a party to those hearings.

The first issue we address is whether the ICC's finding that Edison complied with its statutory regulations in the operation of its generating units in 1985 and 1986 was error.

As the ICC stated in its order, the gravamen of Cook County's appeal is:

"The basis of the Intervenors' argument that Edison violated economic dispatch in dispatching its western coal plants is Edison's use of incremental or mining charge of reserve coal as the dispatch cost for all western coal, despite the fact that most of the coal consumed in 1985 and virtually all of the coal consumed in 1986 was base coal and the original contracts under which such coal was provided do not provide for the division or procurement into explicit reserve and mining charges. The mining charge equals only about one-fourth of the total fuel cost of western coal. Thus, western coal is dispatched at approximately 25% of the cost passed on through the FAC to ratepayers."

■ As we recently stated in *Moncada v. Illinois Commerce Comm'n* (1991), 212 Ill. App. 3d 1046, 1051-52, 571 N.E.2d 1004:

"The Commission's findings on questions of fact are *prima facie* true, and its orders are *prima facie* reasonable. A reviewing court can only reverse a Commission rule, regulation, order or decision if the Commission is without jurisdiction, its order is not supported by substantial evidence or the order or manner in which it was decided violates Federal or State constitutional laws to the prejudice of the appellant. Furthermore, the party challenging the order has the burden of proof. [Citations.] The Commission's determination of a question of law, however, is not binding on review. [Citation.]"

Cook County makes several arguments that the ICC's order in the case *sub judice* should be reversed. Cook County points out that in addition to complying with section 9—220 of the Act, Edison was governed by other provisions of the Act which require that its fuel procurement and energy dispatch practices in 1985 and 1986 constituted the "least cost means of meeting the utility's service obligations," and that the rates and charges which resulted were just and reasonable. (See Ill. Rev. Stat. 1985, ch. 111²/₃, pars. 8—401, 8—501, 9—101.) The goal of the Act, Cook County notes, is to regulate

utility rates so as to ensure reliable service at the least possible cost to citizens.

According to Cook County, Edison failed to meet the requirements of economic dispatch in its western coal plants by using the incremental cost, which represented only 25% of the cost passed to ratepayers, when Edison was allowed to recover 100% of the cost. This was not a method of providing electricity at the least and minimum cost, and was not a just and reasonable imposition on Edison's ratepayers through the FAC. We disagree.

Decisions of the ICC are entitled to substantial deference because they are judgments of a tribunal appointed by law and informed by experience. (See *Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 165 N.E.2d 329.) A reviewing court may not try a case *de novo*, put itself in the place of the ICC, or substitute its judgment for the ICC's. *Village of Apple River*, 18 Ill. 2d at 523.

There was testimony before the ICC that Edison was contractually obligated to purchase an amount of coal—base coal—and given that Edison was obligated to pay for the base coal, whether it was used or not, it was a fixed cost. Fixed costs are not to be included in incremental costs for the purpose of dispatching. Even Cook County's witness, Dr. Pflaum, acknowledged that a portion of the total cost of the western coal was "sunk." Pflaum, as well as several other witnesses, testified that Edison would be required to pay substantial amounts to terminate its contractual obligations. Further, there was uncontroverted testimony before the ICC that the fixed component of the western coal was to be paid whether Edison took delivery or not. Witnesses also testified that the alternative approaches suggested by Cook County would wind up costing Edison's customers even more.

Section 425.40 requires that the utility must operate its system to achieve minimum overall cost. Upon reviewing the record, we find that the evidence below supports the conclusion that while the western coal itself was more expensive than other coal which Edison could have burned, 75% of the costs for the western coal were fixed pursuant to contract. Using the incremental, nonfixed cost of the western coal for purposes of economic dispatch, as witnesses testified was proper, yielded a lower cost being passed through the FAC than using other available coal, which was more expensive than the incremental, nonfixed portion of the western coal.

■ In sum, we cannot say that the ICC, the expert body of this State in utility issues, ruled contrary to substantial evidence before

it. As Edison properly dispatched its plants on the basis of incremental costs, economic dispatch was satisfied, and economic dispatch being satisfied, following Cook County's logic and the requirements of section 425.40(a) of the Code, Edison operated at minimum overall costs. Section 425.40(a), after all, provides that the operation of the utility system take into account the utility's existing contractual obligations. Section 425.20 of the Code allows for the passing through the FAC of Edison's recovery of "actual, historical costs," which Cook County does not contend are incremental costs. The statutory and Code scheme manifestly allow for a greater recovery through the FAC than that which is used in dispatch.

■ Cook County also argues that the ICC erred in placing the burden of proof in the proceedings *sub judice* upon the governmental intervenors. In support of this assertion, Cook County cites a portion of the ICC order which states: the governmental intervenors' evidence is "insufficient to establish that Edison operated its plants in violation of economic dispatch." While it is true, as Cook County notes, that the supreme court's holding in *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865, would require that allocation of the burden of proof on the intervenors would be error, it is not clear that the ICC actually placed the burden of proof upon Cook County and the other governmental intervenors. The order and the record demonstrate that Edison introduced substantial evidence in its direct case, and the order is more properly read as a suggestion that the intervenors failed to introduce sufficient evidence to rebut Edison's showing that economic dispatch was complied with.

■ The next issue we address is whether it was error for the ICC to consolidate consideration of the prudence of certain 1985 and 1986 Edison coal purchases with the 1988 FAC proceeding.

Cook County makes two different and alternative arguments with respect to the issue of the determination of the prudency of Edison's procurement of western coal in 1985 and 1986. First, Cook County argues that it was error for the ICC not to determine prudency in the underlying proceeding. This argument takes issue with the ICC's decision to defer the issue to a later (and presently litigated) docket. Cook County argues that the Act was violated in the deferment, as a prudency determination need be conducted annually. (See Ill. Rev. Stat. 1985, ch. 111⅔, par. 9—220.) Cook County again argues that the burden of proof on this issue was shifted, noting that the trial court stated in its order of deferment: "Adequate

safeguards can be placed in the orders [in the dockets] to ensure that overcollection for fuel *proven* for years 1985 and thereafter will be credited to customers through the fuel adjustment clause mechanism." (Emphasis added by Cook County.) Cook County argues that deferral was unfair, as customers who have left Edison's system will be difficult to locate. Finally, Cook County argues that deferral was a denial of its and other governmental intervenors' due process rights.

Next, Cook County makes an inconsistent argument, namely: that the ICC actually did make a prudency determination for the years 1985 and 1986, and that this determination (which found prudency) was violative of the law or contrary to the manifest weight of the evidence. Obviously, Cook County cannot be correct in both arguments, and a review of the record reveals that the latter argument, that the ICC did specifically rule on prudency, is untenable. This is so because it ignores plain language in other parts of the order, which specifically states that the prudence of the western coal purchases is set on a later, different docket, and that supplemental orders could be entered in the event that refunds or credits are ordered in the future due to overcollection. The finding in paragraph 9 of the order which Cook County refers to is obviously either mistaken boilerplate language or refers, as Edison suggests, to fuels other than the western coal purchased in those years. Significantly, Cook County has not denied that the other docket proceeds during this appeal, that it is a party to the other docket, or that the prudence of the 1985 and 1986 western coal purchases is being litigated in the other docket.

We further reject Cook County's argument that it was error for the ICC to defer that issue to a later docket. Edison is correct that section 9—220 only requires the ICC to "initiate" hearings to determine prudence of fuel purchases. It does not say that such issues must be disposed of during each year. As Edison points out, an administrative body has wide discretion in shaping and conducting proceedings and hearings. (See *Antioch Milling Co. v. Public Service Co.* (1954), 4 Ill. 2d 200, 210, 123 N.E.2d 302; *Desai v. Metropolitan Sanitary District of Greater Chicago* (1984), 125 Ill. App. 3d 1031, 1033, 466 N.E.2d 1045.) Other prudence issues with respect to contracts for the same coal from the same companies are at issue in the pending docket, and doubtless common questions of fact and law abound in relation to the prudency determinations. Further,

Cook County has not advanced any specific arguments or authority to suggest that the ICC will not be able to adequately determine prudency in 1985 and 1986 in the other docket, or that the ICC will not be able to make appropriate refunds. For this same reason, there is no merit to Cook County's assertion that due process rights were violated. For the foregoing reasons, we hold that it was not error for the trial court to consolidate the original prudency determinations to the later docket.

For the foregoing reasons, we affirm the decision of the ICC.

Affirmed.

McNAMARA and JIGANTI,* JJ., concur.

---

*Justice Rosemary LaPorta participated in oral argument prior to her death. Justice Mel R. Jiganti was substituted on the panel and has listened to the oral argument tape and has read the briefs.